AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

District of New Jersey

United States of America
v.

VIJAY VANAM REDDY,
a/k/a "Jay Reddy"

_____
Defendant(s)

)
)
)
)
)
)
)

Case No.

20-mj-2136 (AMD)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____Dec. 2015 - at least Nov. 2018____ in the county of ____Burlington and elsewhere____ in the

_____ District of ____New Jersey____ , the defendant(s) violated:

| Code Section | Description of Offenses |
|---|---|
| Title 18, U.S.C., Section 1349. | Conspiracy to commit wire fraud.  See Attachment A. |

This criminal complaint is based on these facts:

See Attachment B

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent James Webb, FBI
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ (specify reliable electronic means).

Date:   ____12/04/2020____

_____
Judge's signature

City and state:   ____District of New Jersey____

Hon. Ann Marie Donio, U.S. Magistrate Judge
_____
Printed name and title

CONTENTS APPROVED
UNITED STATES ATTORNEY


By:   _Daniel A. Friedman_

      Daniel A. Friedman
      Diana V. Carrig
   Assistant U.S. Attorneys


Date:  <u>December 4, 2020</u>

## ATTACHMENT A

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

From at least as early as December 2015 through at least as late as August 2018, in Burlington County in the District of New Jersey and elsewhere, the defendant

**VIJAY VANAM REDDY,**
a/k/a "Jay Reddy,"

did knowingly and intentionally conspire and agree with DAVID WEINSTEIN, KEVIN BROWN and others to devise a scheme and artifice to defraud Victims 1 through 43, and others, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343, including but not limited to, the wire transactions set forth below and as further described in Attachment B:

| Wire Date | Description |
|-----------|-------------|
| 11/17/2016 | Wire transfer in the amount of approximately $155,000 from Victim 20 to a bank account controlled by WEINSTEIN for the purchase of a business opportunity sold by REDDY and brokered by BROWN, which was processed through Federal Reserve facilities in New Jersey and Texas. |
| 12/19/2016 | Wire transfer in the amount of approximately $100,000 from Victim 20 to a bank account controlled by WEINSTEIN for the purchase of a business opportunity sold by WEINSTEIN and brokered by BROWN, which was processed through Federal Reserve facilities in New Jersey and Texas. |
| 4/26/2017 | Wire transfer in the amount of approximately $75,000 from Victim 31 to a bank account controlled by WEINSTEIN for the purchase of a business opportunity sold by WEINSTEIN and brokered by BROWN, which was processed through Federal Reserve facilities in New Jersey and Texas. |
| 5/3/2018 | Wire transfer in the amount of approximately $75,000 from Victim 42 to a bank account controlled by BROWN for the purchase of a business opportunity sold by WEINSTEIN and brokered by BROWN, which was processed through Federal Reserve facilities in New Jersey and Texas. |

Contrary to Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1349.

**ATTACHMENT B**

I, James Webb, a Special Agent with the Federal Bureau of Investigation ("FBI"), Philadelphia Division, being duly sworn, depose and state as follows:

1.      I have been employed as an FBI Special Agent for more than five years.  Since November 2015, I have been assigned to the South Jersey Resident Agency of the FBI.  I have investigated criminal violations related to economic crimes, child exploitation, and violent crimes.  In my capacity as a Special Agent, I have received training and gained experience in search, seizure, and arrest procedures; and in investigating money laundering, internet crimes against children, fraud, and various other crimes.  I have participated in, and conducted, many criminal investigations involving violations of the laws of the United States, including but not limited to laws relating to false, fictitious, and fraudulent claims, wire fraud, mail fraud, money laundering, and computer-related offenses.  I worked as a police officer for approximately one year prior to joining the FBI. I have not included every detail or every aspect of my training, education, and experience but have highlighted those areas most relevant to this application.

2.      The information contained in this Affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers (including officers who have engaged in numerous investigations involving fraud, money laundering, and computer-based crimes), victim interviews, and the review of documents and records.  Because this Affidavit is being submitted for the limited purpose of establishing probable cause to issue a complaint, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to support the charges in the complaint. Unless specifically indicated, all conversations and statements described in this Affidavit are related in substance and in part.

## SUMMARY OF FRAUDULENT SCHEME

3.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that DAVID WEINSTEIN (hereinafter "WEINSTEIN"), VIJAY VANAM REDDY (hereinafter "REDDY"), and KEVIN BROWN (hereinafter "BROWN") (collectively, the "Targets"), knowingly conspired with each other and with individuals and entities known and unknown, to defraud unsuspecting victims in the United States by selling them business opportunities under false and fraudulent pretenses.

1

4.      The business opportunities at the heart of the scheme are related to the medical field.  The Targets advertised and sold "blocks" of contracts with medical providers who allegedly wanted to outsource their medical billing, collections, appeals, answering, credentialing, or transcription functions,[1] with the understanding that the buyers would then provide the contracted services to the medical providers for a profit.  While the Targets recruited a small number of legitimate medical providers who agreed to outsource these functions to buyers, the Targets fraudulently sold large blocks of providers that bore no relation to the small numbers of enrolled providers.  Throughout the sale process, the Targets materially misrepresented the nature and profitability of the business opportunities as well as their track record in selling the business opportunities.

5.      To induce buyers to purchase the business opportunities, the Targets failed to disclose conflicts of interest and created fake references of "buyers" who vouched for their business "purchases" from the Targets.  The Targets also designed contracts with buyers so that a portion of the purchase price was due only upon delivery of the contracted providers to create the illusion that the Targets had an incentive to provide the promised clients.

6.      The Targets received sizable down payments upon executing contracts to deliver blocks of providers to buyers and then delivered only a small fraction of the promised providers.  When the buyers asked the Targets to satisfy their contractual obligations or, alternatively, to refund the down payments, the Targets made excuses or threats and often stopped responding at all.

---

[1] Based on my training and experience and information learned in this investigation, I know that:

    a.  medical billing refers to the process of submitting claims to insurance companies in order to facilitate payment for services provided by a medical provider;

    b.  medical collections refers to the process of assisting medical providers in collecting money from patients who owe co-pays, deductibles, or non-covered services;

    c.  medical appeals refers to the process of challenging claims for reimbursement that were previously denied by insurance companies;

    d.  medical answering services refers to the business of providing an after-hours answering service for medical providers;

    e.  medical credentialing refers to the process of evaluating a medical provider's skills, training, experience, qualifications, and ability to provide a particular service or perform a specific procedure; and

    f.  medical transcription refers to the process of transcribing verbally dictated notes into written records.

7.     The Targets repeatedly sold new blocks of providers even though they had not delivered the providers they already were contractually required to deliver to previous buyers.

8.     In addition to selling blocks of medical providers, it was a part of the Targets' scheme to periodically sell previously-signed contracts with block buyers/victims, including the right to any future payments from the buyers/victims.[2]  By transferring these unfulfilled contracts, the Targets attempted to insulate themselves from complaints or legal action from disgruntled buyers/victims.  When the buyers/victims complained about the Targets' failure to deliver the contractually-promised providers, the Targets would tell the buyers/victims that a new owner was now responsible for fulfilling the contracts and that non-compete clauses prevented the Targets from discussing their contracts.  The new owners—some of whom were themselves unwitting purchasers of marketing businesses under fraudulent pretenses—were then subject to complaints from victims of the Targets' scheme.  The Targets continued to sell business opportunities to new buyers/victims.

9.     From at least as early as September 2015 through at least as late as August 2018, this investigation has identified approximately 43 fraudulent sales through the Targets' scheme.[3]  Collectively, these 43 buyers/victims were directed to send—and actually sent—more than $3.1 million to bank accounts controlled by the Targets.[4]  None of the victims interviewed during the investigation received the contractually-promised level of business.

## THE TARGETS

10.     At times relevant to this investigation, DAVID WEINSTEIN was a resident of Cherry Hill, New Jersey, Las Vegas, Nevada and Dallas, Texas.

---

[2] The contracts were marketed and sold as "contingent assets" because the buyers/victims were contractually required to make additional payments upon delivery of the promised clients.

[3] Because some buyers joined with other buyers to purchase a business opportunity from the Targets, the number of individual victims exceeds 43.

[4] Based on a review of bank records, federal law enforcement agents have tentatively identified an additional 21 buyers/victims who collectively paid an additional $1.1 million. These buyers/victims, however, have not yet been interviewed and, therefore, cannot be included among the confirmed victims.  The most recent suspected victims of this scheme purchased business opportunities from the Targets in April 2020.

WEINSTEIN made false representations to many of the buyers/victims before they agreed to purchase the business opportunities and signed many of the contracts of sale with the buyers/victims.

11.     At times relevant to this investigation, VIJAY VANAM REDDY, a/k/a "JAY REDDY" was a resident of Ypsilanti, Michigan and Milan, Michigan.  REDDY made false representations to many of the buyers/victims, signed many of the contracts of sale with the buyers/victims, acted as business broker for some sales, and often provided training to the buyers/victims.

12.     At times relevant to this investigation, KEVIN BROWN was a resident of Palmyra, New Jersey; Philadelphia, Pennsylvania; and Burlington, New Jersey.  BROWN served as the business broker for most of the sales of business opportunities and facilitated pre-sale conversations between buyers/victims and WEINSTEIN and REDDY.  BROWN received commissions for the sales he brokered.

13.     In order to explain the scheme, this affidavit includes summaries of the Targets' sales of business opportunities to three of the 43 identified sets of buyers/victims.  These summaries are followed by a chart of the 43 identified victims and their payments to the Targets.  As explained below, federal law enforcement agents have linked each of the victims with the Targets by various means, including but not limited to an examination of email communications, bank and other financial records, and victim interviews.

## VICTIMS 20a and 20b

14.     On or about November 1, 2016, Pennsylvania residents Victim-20a and Victim-20b responded to an advertisement posted on www.businessesforsale.com[5] offering to sell a Medical Billing business opportunity.

15.     In response to their inquiry, BROWN emailed a non-disclosure agreement ("NDA") and wrote that once BROWN received the completed NDA,

---

[5] I have visited the website of www.businessesforsale.com, which contains the following description of itself: "the world's most popular website for buying or selling a business. Established in 1996, the website is an international marketplace of businesses for sale. We provide a cost-effective route to market for business owners and their representatives and a one stop shop for aspiring entrepreneurs and business buyers."

he would send "a selling memo."  On or about November 1, 2016, Victim-20b completed and signed the NDA, which was between Victim-20b and TANNENBAUM & MILASK INC., Business Brokers, 525 Route 73 North, Five Greentree Centre, Suite 104, Marlton, New Jersey.[6]  On or about November 2, 2016, BROWN spoke with Victim-20b via telephone and made the following statements:

    a. REDDY—a "marketing genius"—was the former owner of a medical billing and answering service company.  REDDY sold his business because he found it too stressful to operate on a day-to-day basis.

    b. REDDY had a special talent for finding physician offices in need of medical billing and answering services.

    c. No medical billing customers were currently available, but REDDY had providers in need of medical answering services.

16.    Later on November 2, 2016, BROWN emailed Victim-20b prospectuses for two business opportunities—Medical Answering Services and Medical Dental Billing—offered for sale by Revenue Asset Services.[7]  The prospectus bore the name of Tannenbaum & Milask Business Brokers.

17.    The Medical Answering Service prospectus defined the business as follows:

This unique model for sale is a book of business contracts with Medical Doctors to support their Medical Practices.  This company supports physician's offices by performing their medical answering service needs.  Included with your purchase of this business is the necessary tools, contractors, and training.  In addition, Revenue

---

[6] Tannenbaum & Milask was once a legitimate brokerage firm. WEINSTEIN acquired the name in 2012 and began using it in connection with the fraudulent scheme.  Based on my training and experience, I know that perpetrators of fraudulent schemes occasionally use the names of well-known and reputable businesses to lend legitimacy to their business. The address 525 Route 73 North, Five Greentree Centre, Suite 104, Marlton, New Jersey is operated by Intelligent Office, an office space rental facility, and is located in Burlington County. Based on my training and experience, I know that perpetrators of fraudulent schemes sometimes use office rental spaces to lend an air of legitimacy to their operations.

[7] Revenue Asset Services, LLC was registered in Michigan on March 24, 2014 by REDDY, using the address that was REDDY's residence at the time.

Asset Services will introduce you to vendors providing support for
the answering service, if you choose to use them.

18.     The prospectus stated that Revenue Asset Services would provide a
"guaranteed" client base to the buyer.

19.     The prospectus stated that if 300 clients were purchased, the
business opportunity would produce a projected annual gross revenue of
$248,400.00 and would have estimated expenses of $112,800.00, resulting in
an annual profit of $135,600.00.  The prospectus identified the asking price for
300 clients as $125,000.00, with a $75,000.00 down payment.

20.     BROWN explained in his November 2, 2016 email that Victim-20a
and Victim-20b could multiply their profits by purchasing contracts with 700
clinic contracts for $210,000.00 (with a $135,000.00 down payment) or 1,000
clinics for $230,000.00 (with a $155,000.00 down payment).

21.     On or about November 7, 2016, Victim-20a and Victim-20b
participated in a conference call with BROWN and REDDY.  On the conference
call, REDDY stated that he could provide Victim-20a and Victim-20b with
1,000 clinics as quickly as they wanted.  REDDY also told Victim-20a and
Victim-20b that he could not divulge any specifics about his marketing skills
because they were a trade secret.[8]

22.     Victim-20a and Victim-20b asked BROWN to provide references of
individuals who had previously purchased business opportunities from
REDDY.  On or about November 14, 2016, BROWN emailed Victim-20b names
and phone numbers for two references:  "Anna McClintock" (XXX-XXX-5723)
and "Andy Berger" (XXX-XXX-0519).  On or about November 15, 2016, BROWN
emailed Victim-20b with a corrected phone number for reference "Anna
McClintock" (XXX-XXX-9052) since the previously provided number was out of
service.

23.     The investigation has revealed that "Anna McClintock" is an alias

---

[8] Based on materials reviewed in the investigation, the marketing employed by the Targets
appears to consist primarily of purchasing a list of facsimile numbers associated with medical,
dental, and other similar providers and faxing a flyer offering services to a large number of
facsimile numbers in a specific state or area code.  Numerous responses to faxes sent by the
Targets, which I have reviewed, requested a cessation of the unsolicited advertisements from
the Targets.

for a relative of REDDY (hereinafter "REDDY's relative") and that "Andy Berger" is an alias for WEINSTEIN.

24.     The first phone number provided to Victim-20a and Victim-20b for "Anna McClintock" was obtained through YMax Communications, also known as MagicJack, a company that provides users with telephone numbers that they can use to make and receive telephone calls over the Internet using an Internet connected device.  The phone number was active between on or about March 27, 2015 and on or about March 27, 2016.  The credit card used to register "Anna McClintock's" YMax Communications phone number was issued to REDDY and the email address associated with the phone number was REDDY's email address.  The second phone number provided to Victim-20a and Victim-20b for "Anna McClintock" was obtained through Ad Hoc Labs, a company that provides users with free telephone numbers that they can use to make and receive telephone calls over the Internet using an Internet connected device.  The phone number was active between April 29, 2016 and January 24, 2017.  The phone number used to register "Anna McClintock's" Ad Hoc Labs phone number was the same number provided by REDDY's relative, along with her Michigan Driver's License, when REDDY's relative opened a United Parcel Service mailbox to receive mail for several of REDDY's businesses, including Revenue Asset Services.

25.     The phone number provided to Victim-20a and Victim-20b for "Andy Berger" also was obtained through Ad Hoc Labs.  The phone number was active between August 11, 2016 and February 23, 2017.  The phone number used to register "Andy Berger's" Ad Hoc Labs phone number was subscribed to by WEINSTEIN through AT&T.[9]

26.      "Anna McClintock" and "Andy Berger" both told Victim-20a and Victim-20b that they recommended doing business with REDDY.

27.     On or about November 15, 2016, BROWN emailed Victim-20a and Victim-20b a copy of REDDY's United States passport and a link to a State of Michigan website indicating that REDDY was the registered agent for American Medical Answering Service LLC.

---

[9] The investigation has revealed that the Targets provided the names of "Anna McClintock" and "Andy Berger" as references to other prospective buyers, using various phone numbers for each individual.  The investigation has revealed that the telephone numbers were obtained through companies that provide users with free telephone numbers for Internet calling and that the telephone numbers for "Anna McClintock" were obtained by REDDY's relative and that telephone numbers for "Andy Berger" were obtained by WEINSTEIN.

28.    On or about November 16, 2016, Victim-20b signed the sales contract that had been provided by BROWN and emailed it to BROWN.  Later that day BROWN emailed a fully-executed copy of the contract that had been countersigned by REDDY on behalf of American Medical Answering Services LLC, to Victim-20b.  The contract stated that:

> **Medical Answering Service:** Seller will deliver 1,000 medical answering service contracts at a minimum charge of $69 per office per month.

29.    The contract further stated that the buyer would pay American Medical Answering Services LLC a down payment of $155,000.00 and simultaneously execute a promissory note in the amount of $75,000.00, which would be due when all clients were assigned.

30.    On or about November 17, 2016, Victim-20a and Victim-20b visited a financial institution located in Pennsylvania and authorized the issuance of a wire transfer in the amount of $155,000.00 from a bank account controlled by Victim-20a and Victim-20b to Republic Bank account number xxx4028 held by Tannenbaum & Milask Inc.[10]  This wire was processed by computer servers located in Texas and New Jersey.

31.    Based upon bank records, the $155,000.00 from Victim-20a and Victim-20b's wire were distributed from Republic Bank account number xxx4028 held by Tannenbaum & Milask Inc. as follows:

  a. On or about November 17, 2016, a cashier's check was issued in the amount of $75,500.00 made payable to REDDY's relative;

  b. On or about November 17, 2016, a check was issued in the amount of $17,500.00 made payable to BROWN; and

  c. A small portion of the remaining $155,000.00 wire from Victim-20a and Victim-20b was spent on www.bizbuysell.com advertisements.

---

[10] The signatory on Republic Bank account xxx4028 was WEINSTEIN.  The Targets did not disclose WEINSTEIN's control of the Tannenbaum & Milask Inc. bank account to Victim-20a and Victim-24b.

d. The remainder was spent on WEINSTEIN's personal expenses, or transferred to other bank accounts controlled by WEINSTEIN.

32.    By late November 2016, REDDY had provided Victim-20a and Victim-20b with only approximately three of the 1,000 contracted clients. REDDY emailed Victim-20b that the Thanksgiving holiday had "messed up all my momentum."  REDDY further stated that the holidays in December would likely result in a similar lull in contract acquisition.

33.    While waiting to receive Medical Answering Service clients, Victim-20b inquired about a www.bizbuysell.com[11] advertisement for a Medical Billing business opportunity and BROWN responded.

34.    BROWN sent Victim-20b a prospectus for a Medical Billing business opportunity offered by American MD Companies, JV.  The prospectus bore the name of Tannenbaum & Milask, 525 Route 73 North, Five Greentree Centre, Suite 104, Marlton, New Jersey.

35.    The medical billing prospectus defined the business as follows:

This business opportunity for sale is a book of business contracts with Medical Doctors to support their Medical Practices.   This company supports physician's offices by performing their medical insurance billing.  Included with your purchase of this business is the necessary software and training.  In addition, American MD Companies, JV will introduce you to vendors providing support in the billing area if you choose to use them.

36.    The prospectus stated that American MD Companies, JV would provide a "guaranteed" client base to the buyer.

37.    The prospectus stated that the business opportunity had projected annual gross revenue of $648,000.00 and estimated total expenses of $433,000.00, resulting in an annual profit of $215,000.00.  The prospectus identified the asking price for the business as $175,000.00, with a $125,000.00 down payment.

---

[11] I have visited the website of www.bizbuysell.com/about, which contains the following description of itself: "the Internet's largest and most heavily trafficked business for sale marketplace, with more business for sale listings, more unique users, and more search activity than any other service. BizBuySell currently has an inventory of over 45,000 businesses for sale and more than 1.4 million monthly visits."

38.    BROWN offered Victim-20b a special deal for 150 physician offices, each with an expected 200 billing claims per month.

39.    On or about December 17, 2016, Victim-20b signed a sales contract for the purchase of 150 medical billing clients and emailed it to BROWN.  BROWN then emailed the contract to REDDY and WEINSTEIN requesting a signature.  Later that same day, REDDY emailed a fully-executed copy of the contract that had been countersigned by WEINSTEIN[12] on behalf of American MD Companies, JV, to Victim-20b.  The contract stated that:

**Medical Billing:** Seller will deliver in the future 150 medical practices whose total monthly claims will average a goal of 30,000 claims in any 30-day period.  If Buyer has not reached 30,000 claims in any 30-day period, then the Sole Remedy will be as follows: Seller will add a maximum of 30 additional offices.

40.    The contract further stated that the buyer would pay American MD Companies, JV $100,000.00 immediately; another $75,000.00 upon receipt of 75 medical billing clients; and would execute a promissory note in the amount of $50,000.00, which would be due when all clients were received.

41.    On or about December 17, 2016, BROWN sent an email to Victim-20a and Victim-20b with the Subject Line "Congratulations".  The email stated:

You now have 2 babies!
Once you get past the diapers... It will be all joy!
The best to you and your family in this endeavor also, and look forward to working with you with your future plans!

42.    On or about December 19, 2016, Victim-20b visited a financial institution located in Pennsylvania and authorized the issuance of a wire transfer in the amount of $100,000.00 from a bank account controlled by Victim-20b to Republic Bank account number xxx4028 held by Tannenbaum & Milask Inc.  This wire was processed by computer servers located in Texas and New Jersey.

---

[12] The signature on the contract matches resembles the signature provided for Republic Bank account number xxx4028 held by Tannenbaum & Milask Inc., which was opened by WEINSTEIN, as well as on other contracts signed by WEINSTEIN that I have viewed during the course of the investigation.

43.     Based upon bank records, the $100,000.00 from Victim-20a and Victim-20b was distributed from Republic Bank account number xxx4028 held by Tannenbaum & Milask Inc. as follows:

   a.  On or about December 20, 2016, a check was issued payable to BROWN in the amount of $15,000.00.

   b.  A small portion of the $100,000.00 wire from Victim-20a and Victim-20b was spent on www.bizbuysell.com advertisements.

   c.  The remainder was spent on WEINSTEIN's personal expenses or transferred to other bank accounts controlled by WEINSTEIN.

44.     REDDY provided training to Victim-20a and Victim-20b on the medical billing business.  During the training, Victim-20a asked REDDY about WEINSTEIN's involvement and REDDY explained that REDDY operated the medical answering service side of the business and that WEINSTEIN operated the medical billing side of the business.

45.     On or about January 23, 2017, Victim-20b emailed REDDY and WEINSTEIN stating that REDDY and WEINSTEIN had provided only five of the 1,000 contracted answering service clients in the two months since the Medical Answering Service contract was signed and only three of the 150 billing clients in the month since the Medical Billing contract was signed. Victim-20b further asserted that the volume of claims per medical billing client was "extremely small." Victim-20b requested information about the pace of client acquisition.

46.     Neither REDDY nor WEINSTEIN responded to Victim-20b's January 23, 2017 email.  On or about February 6, 2017, Victim-20a emailed REDDY requesting information about the slow pace of client acquisition.  REDDY responded that "I'm going to retool the answering.  The market seems to have changed since the last time I did a campaign.  I may go after veterinarians instead to pick up the slack."

47.     On or about February 21, 2017, Victim-20b emailed REDDY, WEINSTEIN, and BROWN.  Victim-20b wrote that the volume of medical billing claims was too low to be profitable.  Victim-20b requested a refund of the $205,000.00 of the $255,000.00 paid for the businesses.

48.     On or about February 21, 2017, REDDY responded that "with

11

regard to the answering service, I am retooling as the market has significantly changed since the last time I did a campaign.  This was not foreseen or knowable at the time the agreement was signed."  REDDY disclaimed responsibility for the medical billing business because WEINSTEIN signed that contract.

49.    On or about February 21, 2017, WEINSTEIN emailed approximately six responses within the span of approximately 20 minutes accusing Victim-20b of falsifying the facts and being unreasonable.

50.    On or about March 22, 2017, Victim-20b emailed REDDY that because of the small number of clients, Victim-20b would be forced to shut down the answering service business.  Victim-20b requested a refund of $135,000 of the $155,000 paid for the answering service business.

51.    As of the date of this affidavit, Victim-20a and Victim-20b have not been refunded any of the money they paid for the Medical Answering Service and Medical Billing business opportunities.

## VICTIMS 31a and 31b

52.    On or about April 6, 2017, California resident Victim-31a responded to an advertisement for a Medical Billing business opportunity that was posted to www.bizquest.com.[13]  On or about April 10, 2017, Victim-31a completed and signed an NDA, which was between Victim-31a and Tannenbaum & Milask, Inc. Business Brokers, 525 Route 73 North, Five Greentree Centre, Suite 104, Marlton, New Jersey.

53.    BROWN subsequently sent Victim-31a an email attaching a business prospectus for a Medical Billing business opportunity offered for sale by Medasset Corporation.  The prospectus also bore the name and address of Tannenbaum & Milask Business Brokers.

54.    The prospectus defined the business as follows:

This business opportunity for sale is a book of business contracts with Medical Doctors to support their Medical Practices.  This company supports physician's offices by performing their medical insurance billing.  Included with your purchase of this business is

---

[13] I know that like bizbuysell.com, bizquest.com is a brokerage website for selling businesses.

the necessary software and training.   In addition, Medasset Corporation will introduce you to vendors providing support in the billing area if you choose to use them.

What is for sale and what you are buying is a package of the above business disciplines or services to doctors.  Each business discipline will have cash flow from the various doctors' offices, which the seller will provide you.

55.    The prospectus stated that Medasset Corporation would provide a "guaranteed" client base to the buyer.

56.    The prospectus stated that the business opportunity would produce a projected annual gross revenue of $322,920.00 and would have estimated expenses of $145,000.00, resulting in an annual profit of $177,920.00.  The prospectus identified the asking price for the business opportunity as $125,000.00, with a $75,000.00 down payment.

57.    BROWN told Victim-31a that the business for sale would comprise 45 physician offices in need of medical billing services, averaging 200 claims per month.

58.    On or about April 17, 2017, BROWN introduced Victim-31a to WEINSTEIN via telephone.  WEINSTEIN was identified as the business seller and appeared to Victim-31a to be familiar with terminology and business practices in the medical field.

59.    While conducting due diligence, Victim-31a and Victim-31a's business partner, Victim-31b, asked for references of individuals who previously had done business with WEINSTEIN.  WEINSTEIN provided two references:  "Anna McClintock" (XXX-XXX-4431) and "Mark Salazar" (XXX-XXX-5387).

60.    The investigation has revealed that "Anna McClintock" is an alias for REDDY's relative and that "Mark Salazar" is an alias for WEINSTEIN.

61.    As described in paragraph 24 above, the phone number provided to Victim-31a and Victim-31b for "Anna McClintock" was obtained through Ad Hoc Labs, a company that provides users with free telephone numbers that they can use to make and receive telephone calls over the Internet using an Internet connected device.  This phone number was active between January

13

24, 2017 and April 30, 2017.  The phone number used to register "Anna McClintock's" Ad Hoc Labs phone number was the same number provided by REDDY's relative, in-person, along with her Michigan Driver's License when REDDY's relative opened a United Parcel Service mailbox to receive mail for several of REDDY's businesses, including Revenue Asset Services.

62.     The investigation has revealed that "Mark Salazar" is an alias for WEINSTEIN.  The phone number provided to Victim-31a and Victim-31b for "Mark Salazar" was provided by a company that provides users with free telephone numbers for Internet calling.  The phone number was active between February 10, 2016 and May 5, 2017.  The phone number used to register "Mark Salazar's" phone number was subscribed to by WEINSTEIN through AT&T.

63.     Both references provided Victim-31a and Victim-31b with favorable remarks about their purported business dealings with WEINSTEIN.

64.     Subsequently, BROWN sent a contract to Victim-31a.  The initial contract sent by BROWN did not include a timeline for delivery of clients, but WEINSTEIN agreed to a request from Victim-31a to add an 18-month deadline for delivery of clients.

65.     Victim-31a and Victim-31b signed the sales contract and emailed it to BROWN on or about April 22, 2017.  BROWN forwarded the contract to WEINSTEIN, who signed it on behalf of Medasset Corporation.[14]  Later that day, BROWN emailed a copy of the fully-executed contract to Victim-31a.  The contract stated that:

> **Medical Billing:** Seller will deliver within 18 months of execution of contract 45 medical practices whose total monthly claims will average a goal of 9,000 claims in any 30-day period.  If Buyer has not reached 9,000 claims in any 30-day period, then the Sole Remedy will be as follows: Seller will add a maximum of 15 additional offices.

66.      The contract further stated that the buyer would pay Medasset Corporation a $75,000.00 down payment and would execute a promissory note in the amount of $50,000.00, which would be due when all clients were received.

---

[14] Medasset Corporation was registered in Nevada on November 17, 2016 by WEINSTEIN.

67.     On or about April 26, 2017, Victim-31a authorized the issuance of a wire transfer in the amount of $75,000.00 from a bank account controlled by Victim-31a to bank account number xxx4028 held in the name of Tannenbaum & Milask, Inc. at Republic Bank.  This wire was processed by computer servers located in Texas and New Jersey.

68.     On or about April 26, 2017, $50,000.00 was transferred from account number xxx4028 to bank account xxx8699 held in the name of Medservice Group at Republic Bank.  Bank account number xxx8699 is controlled by WEINSTEIN.  Thereafter, WEINSTEIN transferred funds from bank account xxx8699 to other bank accounts controlled by WEINSTEIN and used funds in bank account xxx8699 on personal expenses in various locations, including Japan, Hawaii, and Las Vegas.

69.     On or about April 26, 2017, $15,000.00 was transferred from account xxx4028 to bank account xxx8710 held by WEINSTEIN at Republic Bank.  On or about April 30, 2017, a check was issued from account xxx8710 to BROWN in the amount of $18,000.00.  The memo line of the check contained Victim-31a's first name and the words "2 commission."  Based on my training and experience and information learned through the investigation, I believe that the $18,000.00 check represented commissions for sales of business opportunities to Victim-31a and another buyer/victim.

70.     By September 2017—approximately five months after signing the contract—Victim-31a and Victim-31b had received approximately ten medical billing clients but those clients collectively were submitting only approximately 30 claims per month.  On or about September 19, 2017, Victim-31a emailed WEINSTEIN about the "extremely limited volume."  In November 2017, Victim-31a emailed WEINSTEIN again that the provided clients had very little claims activity.  In January 2018, Victim-31a emailed WEINSTEIN that only four clients were currently active and again asked about the delivery of new clients.  Victim-31a also emailed WEINSTEIN to ask about clients in March 2018, August 2018, January 2019, February 2019, March 2019, and June 2019.

71.     WEINSTEIN's responses to these emails included that he was "involved in a marketing campaign as we speak;" that he was "going on a marketing tear;" that he "should have some for you late next week;" that he "will push clients over to you this month;" that the "Next one in is yours!" and that "I will surely transfer the next few coming in."

15

72.     By the expiration of the 18-month contract term, Victim-31a and Victim-31b had received only 15 Medical Billing clients and only three of those clients were actively sending billing requests.

## VICTIMS 42a and 42b

73.     On or about April 20, 2018, Victim-42a and Victim-42b of Illinois responded to an advertisement for a medical credentialing and medical appeals business opportunity that was posted on www.bizquest.com.  In response to their inquiry, on or about April 27, 2018, BROWN sent a prospectus for a medical billing business opportunity offered by "MedAsset Corporation."  The prospectus bore the name of Visionary Business Brokers, 1401-I Route 130 South, Suite 343, Cinnaminson, New Jersey,[15] and listed BROWN's mobile telephone number.

74.     The medical billing prospectus defined the business as follows:

> This business opportunity for sale is a book of business contracts with Medical Doctors to support their Medical Practices.  This company supports physician's offices by performing their medical insurance billing.  Included with your purchase of this business is the necessary software and training.  In addition, Medasset Corporation will introduce you to vendors providing support in the billing area, if you choose to use them.

75.     The prospectus stated that Medasset Corporation would provide a "guaranteed" client base to the buyer.

76.     The prospectus stated that the business opportunity had projected annual gross revenue of $322,920.00 and estimated expenses of $145,000.00, resulting in an annual profit of $177,920.00.  The prospectus identified the asking price for the business as $125,000.00, with a $75,000.00 down payment.

77.     The following day, on or about April 28, 2018, BROWN spoke to

---

[15] Visionary Business Brokers LLC was registered by BROWN with the State of New Jersey on or about May 30, 2017.  The business address is a mailbox rental facility operated by the United Parcel Service ("UPS") Store and is located in Burlington County.  Based on my training and experience, I know that perpetrators of fraudulent schemes often use UPS rental mailboxes and refer to the mailbox number as a "suite" to make it appear that they operate out of a legitimate physical office.

Victim-42a and Victim-42b via telephone to discuss the business for sale. Subsequently, BROWN sent a sales contract to Victim-42a for review.  BROWN also stated that "Dave"—presumably referring to WEINSTEIN—thought that Victim-42a and Victim-42b would be a great fit for the business operation.

78.    On or about May 2, 2018, Victim-42a and Victim-42b participated in a conference call with WEINSTEIN and BROWN.  WEINSTEIN stated that he had sold similar business opportunities previously and the buyers had been successful.  When asked why he was selling the business opportunity, WEINSTEIN stated that he was dealing with health issues and no longer wanted to deal with managing employees, but that he would conduct marketing and provide clients for Victim-42a and Victim-42b to provide medical billing services.

79.    Victim-42a and Victim-42b asked for a reference of an individual who had previously purchased a business opportunity from WEINSTEIN. WEINSTEIN provided the name of REDDY.  On a telephone call, REDDY told Victim-42a that REDDY had purchased several business opportunities from WEINSTEIN and those businesses had been successful.  WEINSTEIN did not disclose that REDDY was WEINSTEIN's business partner.

80.    On or about May 3, 2018, Victim-42a signed the sales contract and emailed it to BROWN.  The following day, May 4, 2018, BROWN emailed a copy of the fully-executed contract that had been countersigned by WEINSTEIN, on behalf of Medasset Corporation, to Victim-42a.  The contract stated that:

> **Medical Appeals:** Seller will deliver, over the course of nine months from the date of signing this agreement, 60 medical practices, whose total annual uncollected receivables will average a goal of $5 million dollars annually.

> **Medical Credentialing:** Seller will deliver, over the course of nine months from the date of signing this agreement, 30 medical offices who are seeking credentialing services."

81.    The contract further stated that the buyer would pay Medasset Corporation a $75,000.00 down payment and simultaneously execute a promissory note in the amount of $50,000.00, which would be due when all clients were assigned.

82.    On or about May 3, 2018, Victim-42a visited a financial institution

located in Wilmette, Illinois and authorized the issuance of a wire transfer in the amount of $75,000.00 from a business account controlled by Victim-42a and Victim-42b to bank account number xxx2905 held by Visionary Business Brokers at Beneficial Bank.  This wire was processed by computer servers located in Texas and New Jersey.  Account xxx2905 is controlled by BROWN.

83.   On or about May 4, 2018, $13,300.00 was transferred from bank account number xxx2905 to small business checking bank account number xxx6406, held by Kevin Brown dba New Liberation Wellness, at Beneficial Bank.  Account xxx6406 is controlled by BROWN.

84.   On or about May 4, 2018, BROWN wrote a check in the amount of $61,677.51 from bank account number xxx2905 payable to Tannenbaum & Milask.  On or about May 4, 2018, the $61,677.51 check was deposited into bank account number xxx4028 held by Tannenbaum & Milask Inc. at Republic Bank, which is controlled by WEINSTEIN.  Thereafter, WEINSTEIN transferred funds in bank account xxx4028 to other bank accounts controlled by WEINSTEIN and used funds in bank account xxx4028 on personal expenses.

85.   On or about July 19, 2018, Victim-42a emailed WEINSTEIN to advise that the first client was active, and to ask when additional clients would be received.  WEINSTEIN replied that he would do a big push the next week. He offered another business model or a combination of services if the "big push" did not produce Medical Appeals clients quickly enough.

86.   On or about September 13, 2018, WEINSTEIN sent an email to Victim-42a stating that WEINSTEIN was working to find more clients for them.

87.   On or about September 18, 2018, Victim-42b sent an email to WEINSTEIN and BROWN stating that their pre-sale projections and representations were "entirely inaccurate" and requesting a full refund of the $75,000.00 down payment.

88.   On or about October 1, 2018, the company formed by Victim-42a and Victim-42b filed a civil fraud lawsuit against WEINSTEIN, BROWN, REDDY, Medasset Corporation, and Visionary Business Brokers in the Circuit Court of Cook County, Illinois.  On or about November 6, 2018, WEINSTEIN was served with a copy of the complaint at his residence in Las Vegas, Nevada.

89.   In emails to Victim-42a between on or about November 8, 2018 and on or about November 13, 2018, WEINSTEIN threatened to retaliate

18

against Victim-42a and Victim-42b for filing the lawsuit.

| Email date and time | Email text |
|---|---|
| November 8, 2018; 10:22 a.m. | My Friend<br>You never identified yourself as an attorney<br>Talk about fraud lol<br>My turn for suit<br>Ethics<br>Venue?<br>Rico<br>Better check the statues [sic] in your state<br>I did |
| November 8, 2018; 10:28 a.m. | Kindly notify me which E/O carriers[16] you have.  Or should I call Mr Slim esquire who I have a history of suing attorneys |
| November 13, 2018; 8:27 p.m. | I have counsel.  Counter suit in progress |

90.    As of the date of this affidavit, Medasset Corporation has provided zero of the 30 promised Medical Credentialing clients and three of the 60 promised Medical Appeals clients.  The Medical Appeals clients produced only approximately $400 of the contractually-promised $5 million of annual revenue.

## IDENTIFIED VICTIMS

91.    The FBI has confirmed 43 sets of victims of the Targets' fraudulent business opportunity selling scheme.  Below is a summary of the transactions completed by the confirmed victims:

| Victim | Contract Date(s) | Seller Company | Business Lines Sold | Contract Signer | Wire / Check Date(s) | Payment Amount | Broker |
|---|---|---|---|---|---|---|---|
| 1 | 9/4/15 | MedAsset Management Company LLC | Billing | WEINSTEIN | 9/8/15 | $35,000 | REDDY |

---

[16] I understand "E/O carriers" means professional liability insurance carriers—"E/O" refers to errors and omissions.

| Victim | Contract Date(s) | Seller Company | Business Lines Sold | Contract Signer | Wire / Check Date(s) | Payment Amount | Broker |
|---|---|---|---|---|---|---|---|
| 2 | 10/15/15 | MedAsset Management Company LLC | Collections | WEINSTEIN | 10/14/15 | $30,000 | Broker-1 |
| 3 | 2/22/16 | Revenue Asset Services | Answering Service | REDDY | 2/22/16 | $35,000 | BROWN |
| 4 | 3/6/16 | Revenue Asset Services | Billing; Transcription; Answering Service | REDDY | 3/8/16 3/14/16 | $115,000 | BROWN |
| 5 | 3/28/16 | Medasset Management Company LLC | Appeals | WEINSTEIN | 3/29/16 | $30,000 | BROWN |
| 6 | 5/2/16 | Medasset Management Company LLC | Billing | WEINSTEIN | 5/2/16 | $35,000 | REDDY |
| 7 | 5/2/16 | MedAsset Management Company LLC | Billing; Appeals; Collections; Transcription | WEINSTEIN | 5/2/16 5/13/16 5/20/16 | $135,000 | BROWN |
| 8 | 6/6/16 | Medasset Management LLC | Billing; Appeals | WEINSTEIN | 6/6/16 | $75,000 | BROWN |
| 9 | 6/22/16 | Medasset Management LLC | Billing; Collections | WEINSTEIN | 6/21/16 | $75,000 | BROWN |

20

| Victim | Contract Date(s) | Seller Company | Business Lines Sold | Contract Signer | Wire / Check Date(s) | Payment Amount | Broker |
|---|---|---|---|---|---|---|---|
| 10[17] | 6/24/16 | Medasset Management LLC; Stat Collection Agency LLC, d/b/a Medasset Management Company; American Billing Company; and American Transcription Company LLC | Prior contracts | WEINSTEIN | 6/24/16 | $150,000 | Broker-2 |
| 11 | 7/15/16 | MedAsset Management LLC | Billing | Individual-1 | 7/15/16 | $30,000 | BROWN |
| 12 | 8/7/16 1/21/17 | Revenue Asset Services LLC | Collections; Billing | REDDY | 8/30/16 | $75,000 | REDDY |
| 13 | 8/19/16 | Revenue Asset Services LLC | Collections | REDDY | 8/18/16 | $75,000 | BROWN |
| 14 | 8/29/16 | Revenue Asset Services | Billing | REDDY | 8/29/16 | $31,250 | BROWN |
| 15 | 9/13/16 | Revenue Asset Services | Billing, Collections | REDDY | 9/14/16 | $50,000 | BROWN |
| 16 | 9/28/16 | Revenue Asset Services LLC | Billing | REDDY | 9/28/16 | $29,990 | BROWN |
| 17 | 10/13/16 | Revenue Asset Services, LLC | Answering Service | REDDY | 11/22/16 | $240,000 | BROWN |
| 18 | 11/1/16 | American Medical Answering Services, LLC | Answering Service | REDDY | 10/31/16 | $75,000 | BROWN |

---

[17] Victim 10 met with WEINSTEIN in Burlington County, New Jersey before authorizing the wire transfer for the business opportunity.

| Victim | Contract Date(s) | Seller Company | Business Lines Sold | Contract Signer | Wire / Check Date(s) | Payment Amount | Broker |
|--------|------------------|----------------|---------------------|-----------------|----------------------|----------------|--------|
| 19 | 10/29/16 | Revenue Asset Services | Answering Service | REDDY | 10/31/16 | $45,000 | BROWN |
| 20 | 11/16/16 12/17/16 | American Medical Answering Services, LLC / American MD Companies JV | Answering Service; Billing | REDDY / WEINSTEIN | 11/17/16 12/19/16 | $255,000 | BROWN |
| 21 | 11/29/16 | American Medical Answering Service, LLC | Answering Service | REDDY | 12/12/16 | $75,000 | BROWN |
| 22 | 12/5/16 | American MD Companies JV | Billing | WEINSTEIN | 12/7/16 | $35,000 | BROWN |
| 23 | 12/13/16 | American Medical Answering Services, LLC | Answering Service | REDDY | 12/14/16 | $75,000 | BROWN |
| 24 | 12/29/16 | American MD Companies JV | Billing | WEINSTEIN | 12/28/16 | $72,000 | BROWN |
| 25 | 1/4/17 | American MD Companies JV | Billing | WEINSTEIN | 1/4/17 | $50,000 | BROWN |
| 26 | 3/17/17 | Medasset Corporation | Billing | WEINSTEIN | 3/17/17 | $75,000 | BROWN |
| 27 | 3/21/17 6/12/17 | Medasset Corporation | Billing; Prior Contracts | WEINSTEIN | 3/22/17 | $75,000 | BROWN |
| 28 | 4/6/17 | Medasset Corporation | Billing | WEINSTEIN | 4/6/17 | $75,000 | BROWN |
| 29 | 4/14/17 | American MD Companies JV | Billing; Collections; Appeals | WEINSTEIN | 4/14/17 | $75,000 | Broker-3 |
| 30 | 4/20/17 | Medasset Corporation | Billing | WEINSTEIN | 4/24/17 | $35,000 | BROWN |
| 31 | 4/22/17 | Medasset Corporation | Billing | WEINSTEIN | 4/26/17 | $75,000 | BROWN |

22

| Victim | Contract Date(s) | Seller Company | Business Lines Sold | Contract Signer | Wire / Check Date(s) | Payment Amount | Broker |
|---|---|---|---|---|---|---|---|
| 32 | 7/24/17 | Medasset Corporation | Billing | WEINSTEIN | 7/25/17 | $75,000 | BROWN |
| 33 | 9/7/17 | American MD Companies JV | Billing | WEINSTEIN | 9/8/17 | $75,000 | BROWN |
| 34 | 9/13/17 11/10/17 | Medasset Corporation | Billing; Prior Contracts | WEINSTEIN | 9/13/17 9/25/17 | $75,000 | BROWN |
| 35 | 9/14/17 | Unknown | Billing | WEINSTEIN | 9/14/17 | $75,000 | BROWN |
| 36 | 10/25/17 | Medasset Corporation | Billing | WEINSTEIN | 10/26/17 | $55,000 | BROWN |
| 37 | 11/28/17 | Medasset Corporation | Billing | WEINSTEIN | 11/29/17 | $75,000 | BROWN |
| 38 | 12/4/17 | Medasset Management Company | Billing | WEINSTEIN | 12/4/17 | $35,000 | BROWN |
| 39 | 3/20/18 | Medasset Corporation | Billing | WEINSTEIN | 1/30/18 3/14/18 3/19/18 | $75,000 | BROWN |
| 40 | 4/4/18 | Medasset Corporation | Billing | WEINSTEIN | 4/11/18 | $75,000 | BROWN |
| 41 | 4/13/18 | Medasset Corporation | Billing | WEINSTEIN | 4/13/18 | $75,000 | BROWN |
| 42 | 5/3/18 | Medasset Corporation | Appeals; Credentialing; Billing | WEINSTEIN | 5/3/18 | $75,000 | BROWN |
| 43 | 8/23/18 | Medasset Corporation | Billing | WEINSTEIN | 8/23/18; 9/10/18 | $15,000 | BROWN |
| **Total** | | | | | | **$3,118,240** | |

* Continued on Next Page *

23

Respectfully submitted,

James Webb
Special Agent, FBI

Pursuant to Fed. R. Crim. P. 4.1, Special Agent James Webb was sworn and attested to the contents of this affidavit in support of the issuance of an arrest warrant and criminal complaint charging defendant VIJAY VANAM REDDY, a/k/a "Jay Reddy" with wire fraud conspiracy, as set forth in Attachment A.

_____          Date: December 4 , 2020
HON. ANN MARIE DONIO
United States Magistrate Judge

24